FILED

2008 JAN 25  PM 12: 07

CLERK U.S. DISTRICT COURT
CENTRAL DIST. C  CALIF
LOS ANGELES

BY _____

1   KREINDLER & KREINDLER LLP
    GRETCHEN M. NELSON #112566
2   MARK LABATON #159555
    707 Wilshire Boulevard
3   Los Angeles, California  90017
    Telephone:  (213) 622-6469
4   Facsimile:  (213) 622-6019
    gnelson@kreindler.com
5   mlabaton@kreindler.com

6   LABATON SUCHAROW LLP
    JOEL H. BERNSTEIN
7   JONATHAN M. PLASSE
    BARBARA J. HART
8   RUSSEL N. JACOBSON
    140 Broadway
9   New York, New York  10005
    Telephone:  (212) 907-0700
10  Facsimile:  (212) 818-0477
    jbernstein@labaton.com
11  jplasse@labaton.com
    bhart@labaton.com
12  rjacobson@labaton.com

13  Attorneys for Plaintiffs
    New York Funds
14
    [Additional counsel listed below]
15
             UNITED STATES DISTRICT COURT
16
             CENTRAL DISTRICT OF CALIFORNIA
17
                    WESTERN DIVISION
18

| 19 | NEW YORK CITY EMPLOYEES' RETIREMENT SYSTEM, NEW YORK CITY POLICE PENSION FUND, NEW YORK CITY FIRE DEPARTMENT PENSION FUND, NEW YORK CITY BOARD OF EDUCATION RETIREMENT SYSTEM, TEACHERS' RETIREMENT SYSTEM OF THE CITY OF NEW YORK, THOMAS P. DiNAPOLI, COMPTROLLER OF THE STATE OF NEW YORK, AS ADMINISTRATIVE HEAD OF THE NEW YORK STATE AND LOCAL RETIREMENT SYSTEMS AND AS TRUSTEE OF THE NEW YORK STATE COMMON RETIREMENT FUND and BARRY BRAHN, individually and on behalf of all others similarly situated, | ) | Civil Action No. **CV08-00492 ODW**  **CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**  **Jury Trial Demanded**  PLAx |
|---|---|---|---|

                                      Plaintiffs,

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

1      vs.

2  COUNTRYWIDE FINANCIAL )
CORPORATION, COUNTRYWIDE )

3  CAPITAL V, ANGELO R. MOZILO, )
DAVID SAMBOL, ERIC P. SIERACKI, )

4  STANFORD L. KURLAND, HENRY G. )
CISNEROS, JEFFREY M. )

5  CUNNINGHAM, ROBERT J. DONATO, )
MICHAEL E. DOUGHERTY, BEN M. )

6  ENIS, CARLOS M. GARCIA, ANDREW )
GISSINGER III, EDWIN HELLER, )

7  GWENDOLYN STEWART KING, )
MARTIN R. MELONE, ROBERT T. )

8  PARRY, OSCAR P. ROBERTSON, KEITH)
P. RUSSELL, HARLEY W. SNYDER, )

9  ABN AMRO INCORPORATED, A.G. )
EDWARDS & SONS, INC., BANC OF )

10  AMERICA SECURITIES LLC, )
BARCLAYS CAPITAL INC., BNP )

11  PARIBAS SECURITIES CORP., BNY )
CAPITAL MARKETS, INC., CITIGROUP )

12  GLOBAL MARKETS INC., )
COUNTRYWIDE SECURITIES )

13  CORPORATION, DEUTSCHE BANK )
SECURITIES INC., DRESDNER )

14  KLEINWORT WASSERSTEIN )
SECURITIES INC., GOLDMAN, SACHS )

15  & CO., GREENWICH CAPITAL )
MARKETS, INC., HSBC )

16  SECURITIES (USA) INC., J.P. MORGAN )
SECURITIES INC., LEHMAN )

17  BROTHERS INC., MERRILL, LYNCH, )
PIERCE, FENNER & SMITH )

18  INCORPORATED, MORGAN STANLEY )
& CO. INCORPORATED, RBC CAPITAL )

19  MARKETS CORP., RBC DOMINION )
SECURITIES INC., RBC DAIN )

20  RAUSCHER INC., SCOTIA CAPITAL )
INC., SG AMERICAS SECURITIES, LLC, )

21  TD SECURITIES INC., UBS SECURITIES )
LLC, WACHOVIA CAPITAL MARKETS, )

22  LLC, WACHOVIA SECURITIES, INC., )
GRANT THORNTON LLP and KPMG )

23  LLP, )

24           Defendants. )

25

26

27

28

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS    2

1    Plaintiffs allege the following based upon the investigation of their counsel,

2   which included a review of United States Securities and Exchange Commission

3   ("SEC") filings by Countrywide Financial Corporation ("Countrywide" or the

4   "Company"), as well as regulatory filings and reports, securities analysts' reports

5   and advisories about the Company, press releases and other public statements

6   issued by the Company, media reports about the Company, and their own internal

7   investigation.  Plaintiffs believe that substantial additional evidentiary support will

8   exist for the allegations set forth herein after a reasonable opportunity for

9   discovery.

10

11   **NATURE OF THE ACTION AND SUMMARY OF ALLEGATIONS**

12       1.    This is a federal securities class action brought on behalf of persons

13   who purchased or otherwise acquired the publicly traded securities of Countrywide

14   between April 7, 2004 and August 9, 2007, inclusive (the "Class Period"), seeking

15   to pursue remedies under the Securities Act of 1933 (the "Securities Act") and the

16   Securities Exchange Act of 1934 (the "Exchange Act").

17       2.    Countrywide is one of the largest mortgage lenders in the United

18   States.  Over the past few years, Countrywide enjoyed strong profit growth,

19   reflected in a growing stock price that peaked at $44 per share during the Class

20   Period, for total market capitalization of $25.9 billion.

21       3.    The Company's success was fueled, in large part, by loans made to

22   home buyers and investors whose credit ratings were poor and who would not

23   ordinarily have qualified for traditional loans ("subprime" loans), or individuals

24   who were granted loans despite not providing any proof of income, employment or

25   assets ("Alt-A" loans).  Such traditionally unqualified buyers were lured with

26   introductory and adjustable rates ("teaser rates") that kept monthly payments low

27   for the first few years.  The Company was able to make such loans because real

28   estate prices were growing, which meant that the risk that debtors would be unable

1    to meet payments was mitigated by increasing home prices, which would allow the

2    debtor to refinance or sell the property and enjoy a profit even after satisfying the

3    debt.

4         4.     By the beginning of the Class Period, however, many securities

5    analysts and economic commentators expressed growing concern with the

6    direction of real estate prices, interest rates and the negative impact that these

7    factors could have on lenders, such as Countrywide, who profited handsomely

8    from selling non-traditional loans such as risky sub-prime and low-documentation

9    loans.

10        5.     This action alleges that defendants misled investors by falsely

11   representing that Countrywide had strict and selective underwriting and loan

12   origination practices, ample liquidity that would not be jeopardized by negative

13   changes in the credit and housing markets, and a conservative approach that set it

14   apart from other mortgage lenders.

15        6.     Countrywide CEO Angelo Mozilo repeatedly stated publicly that

16   Countrywide was not engaging in the type of irresponsible lending that other

17   companies engaged in and that was coming under investor scrutiny.  For example,

18   as recently as March 2007, by which time the housing decline had begun and

19   analysts and investors were growing worried, defendant Mozilo, referring to the

20   spreading crisis that threatened many lenders' survival, cavalierly stated that "This

21   will be great for Countrywide . . . because at the end of the day, all of the irrational

22   competitors will be gone."  Such reassurances were baseless and false.

23   Countrywide had for years derived substantial profits from making high-risk loans

24   to unqualified applicants.  For example, it was Countrywide's practice to lend to

25   borrowers who were 90 days late with mortgage payments twice in a year, to

26   borrowers that had filed for bankruptcy, or even to the borrowers who faced

27   foreclosure.

28

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS                4

7.     Countrywide's commission structure rewarded its sales representative for generating riskier loans, because such loans carried higher interest rates, prepayment penalties and other fees that made the loans more profitable to the Company.

8.     A material portion of the Company's loans were made to individuals on a "no-documentation" or "low-documentation" basis, which means that Countrywide gave loans without requiring traditional paperwork, such as income and/or employment or asset verification.  Such loans are referred to in the lending industry as "liar loans" because they allow, if not invite, applicants to inflate their stated income levels and/or assets to obtain credit.  The Company reported such low-documentation loans as "prime" loans even though they were substantially riskier than traditional prime loans, while repeatedly (and falsely) touting Countrywide's supposedly superior and more conservative approach to lending, an approach that, investors were assured, would allow Countrywide to prosper as weaker companies fell by the wayside.

9.     In short, Countrywide's actual lending practices differed materially from the description of those practices in the Company's SEC filings, press releases and conference calls, and the Company's ability to weather the foreseen deterioration in the real estate and credit markets was grossly exaggerated by defendants.  The Company, moreover, improperly inflated its reported earnings by understating its loan loss reserves in SEC filings.

10.     Defendants' misstatements and omissions artificially inflated Countrywide's stock price, allowing Countrywide insiders to sell their personally owned shares to the public investors whom Defendants misled.  Countrywide's CEO, Angelo Mozilo, sold nearly **$450 million** in Countrywide stock, all while reassuring the market that Countrywide's business and prospects were bright and claiming that the problems faced by other lenders were not Countrywide's problems.  In total, Countrywide insiders sold more than **$869 million** of their

1   personally held stock during the Class Period.  Tellingly, the insider selling picked

2   up steam as the real estate crisis grew, with the past 12 months' sales accounting

3   for almost a third of Mozilo's overall sales over the past 23 years.

4       11.    Moreover, insiders sold Countrywide stock at a time when the

5   Company was buying back its own shares pursuant to a repurchase plan instituted

6   in October 2006.  When insiders were selling hundreds of millions of dollars of

7   their Countrywide shares, the Company was purchasing shares on the open market

8   with Company funds.  Although the Company does not report the days on which it

9   purchased its own shares on the open market, it is possible that the Company was

10  on the other side of the insiders' selling transactions.

11      12.    Investors began to learn the truth through partial disclosures by the

12  Company.  On July 24, 2007, Countrywide announced that it was taking a $417

13  million impairment charge and would add $292.9 million to its loan loss reserves,

14  noting that defaults were increasing in the prime market.  In reaction to this news,

15  shares of Countrywide fell 10.5% to close at $30.50 per share.

16      13.    Then, on August 9, 2007, only weeks after reassuring the market that

17  Countrywide had ample liquidity, the Company warned of potential short-term

18  liquidity issues. Shares reacted negatively to this news as well, falling $1.00 per

19  share to close at $27.86 per share. Countrywide's stock continued to decline as its

20  unfavorable condition became apparent, closing in early August 2007 at just above

21  $19 per share, less than half the value it had in February 2007.

22      14.    On August 24, 2007, Countrywide, desperate for financing,

23  announced that Bank of America would invest $2 billion in the Company.

24

25                      **JURISDICTION AND VENUE**

26      15.    The claims asserted herein arise under and pursuant to Sections 11,

27  12(a)(2) and 15 of the Securities Act of 1933 [15 U.S.C. §§ 77k, 77*l*, and 77*o*] and

28  Sections 10(b) and 20(a) of the Exchange Act [15 U.S.C. §§ 78j(b) and 78t(a)] and

1  Rule 10b-5 promulgated thereunder by the Securities and Exchange Commission

2  ("SEC") [17 C.F.R. § 240.10b-5].

3      16.    This Court has jurisdiction over the subject matter of this action

4  pursuant to 28 U.S.C. § 1337, Section 22 of the Securities Act [15 U.S.C. § 77v],

5  and Section 27 of the Exchange Act [15 U.S.C. § 78aa].

6      17.    Venue is proper in this District pursuant to Section 22 of the

7  Securities Act [15 U.S.C. § 77v], Section 27 of the Exchange Act, and 28 U.S.C. §

8  1391(b), as many of the acts and practices complained of herein occurred in

9  substantial part in this District because Countrywide is headquartered in this

10  District.

11      18.    In connection with the acts alleged in this complaint, defendants,

12  directly or indirectly, used the means and instrumentalities of interstate commerce,

13  including, but not limited to, the mails, interstate telephone communications and

14  the facilities of the national securities markets.

15

16                              **PARTIES**

17      19.    Plaintiffs New York City Employees' Retirement System, New York

18  City Police Pension Fund, New York City Fire Department Pension Fund, New

19  York City Board of Education Retirement System, and Teachers' Retirement

20  System of the City of New York (collectively, the "NYC Funds"), as set forth in

21  the certifications previously filed with the Court and incorporated by reference

22  herein, purchased Countrywide common stock on the open market and purchased

23  or acquired other publicly traded securities of Countrywide pursuant or traceable to

24  each Countrywide Registration Statement complained of below at artificially

25  inflated prices during the Class Period, and were damaged thereby.

26      20.    Plaintiff Thomas P. DiNapoli, Comptroller of the State of New York,

27  as Administrative Head of the New York State and Local Retirement Systems and

28  as Trustee of the New York State Common Retirement Fund (collectively, "New

1   York State"), as set forth in the certification previously filed with the Court and

2   incorporated by reference herein, purchased Countrywide common stock at

3   artificially inflated prices during the Class Period and was damaged thereby.

4       21.    On November 28, 2007, pursuant to the Private Securities Litigation

5   Reform Act of 1995, New York State and the NYC Funds (together, the "New

6   York Funds") were appointed to serve as Lead Plaintiff in the consolidated

7   securities class action concerning the publicly traded securities of Countrywide

8   titled Pappas v. Countrywide Financial Corp., No. CV 07-05295 MRP (MANx)

9   (C.D. Cal.).

10      22.    Plaintiff Barry Brahn, as set forth in the certification filed herewith,

11  acquired 7% Capital Securities (preferred securities) issued by Countrywide

12  Capital V pursuant or traceable to the Registration Statement for such securities

13  and was damaged thereby.

14      23.    Defendant Countrywide Financial Corporation ("Countrywide") is a

15  Delaware corporation, headquartered at 4500 Park Granada Boulevard, Calabasas,

16  California 91302.

17      24.    Defendant Countrywide Capital V ("CCV") is a Delaware Statutory

18  Trust and wholly owned subsidiary of Countrywide, created for the purpose of

19  issuing preferred securities.

20      25.    Defendant Angelo R. Mozilo ("Mozilo") served as Countrywide's

21  Chief Executive Officer and Chairman of the Board of Directors throughout the

22  Class Period.

23      26.    Defendant David Sambol ("Sambol") served as Chief Operating

24  Officer of Countrywide starting in September 2006 and for the remainder of the

25  Class Period.

26      27.    Defendant Eric P. Sieracki ("Sieracki") served as Chief Financial

27  Officer of Countrywide since April 2005.

28

1    28.    Defendant Stanford L. Kurland ("Kurland") served as Chief Operating

2 Officer of Countrywide until September 2006.

3    29.    Defendant Kathleen Brown ("Brown") joined Countrywide's Board of

4 Directors in March 2005 and remained a Director until her resignation on March

5 29, 2007.

6    30.    Defendant Henry G. Cisneros ("Cisneros") joined Countrywide's

7 Board of Directors in 2001 and remained a Director until his resignation on

8 October 24, 2007.

9    31.    Defendant Jeffrey M. Cunningham ("Cunningham") is a member of

10 the Countrywide Board of Directors and has been since 1998.

11    32.    Defendant Robert J. Donato ("Donato") is a member of

12 Countrywide's Board of Directors and has been since 1993.

13    33.    Defendant Michael E. Dougherty ("Dougherty") joined

14 Countrywide's Board of Directors in 1998 and remained a Director until he

15 submitted his resignation on March 28, 2007.

16    34.    Defendant Ben M. Enis ("Enis") served as a member of

17 Countrywide's Board of Directors from 1984 until his resignation effective June

18 2006.

19    35.    Defendant Carlos M. Garcia ("Garcia") served as a Director of

20 Countrywide Home Loans, Inc. ("CHL") during the Class Period.

21    36.    Defendant Andrew Gissinger III ("Gissinger") served as a Director of

22 CHL during the Class Period.

23    37.    Defendant Edwin Heller ("Heller") served as a member of

24 Countrywide's Board of Directors from 1993 until his resignation effective June

25 2006.

26    38.    Defendant Gwendolyn Stewart King ("King") joined Countrywide's

27 Board of Directors in 2001 and remained a Director until her resignation took

28 effect on November 15, 2004.

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS          9

1    39.    Defendant Martin R. Melone ("Melone") is a member of
2 Countrywide's Board of Directors and has been since 2003. Defendant Melone
3 also currently serves on the Board of Directors of Countrywide Bank, FSB.

4    40.    Defendant Robert T. Parry ("Parry") is a member of Countrywide's
5 Board of Directors and has been since 2004. Defendant Parry also currently serves
6 on the Board of Directors of Countrywide Bank, FSB.

7    41.    Defendant Oscar P. Robertson ("Robertson") is a member of
8 Countrywide's Board of Directors and has been since 2000.

9    42.    Defendant Keith P. Russell ("Russell") is a member of Countrywide's
10 Board of Directors and has been since 2003.

11    43.    Defendant Harley W. Snyder ("Snyder") is a member of
12 Countrywide's Board of Directors and has been since 1991.

13    44.    Defendants Mozilo, Sambol, Sieracki, Kurland, Brown, Cisneros,
14 Cunningham, Donato, Dougherty, Enis, Garcia, Gissinger, Heller, King, Melone,
15 Parry, Robertson, Russell and Snyder are collectively referred to herein as the
16 "Individual Defendants."

17    45.    Because of the Individual Defendants' positions with the Company,
18 they had access to the adverse undisclosed information about the Company's
19 business, operations, operational trends, financial statements and markets via
20 access to internal corporate documents (including the Company's operating plans,
21 budgets and forecasts and reports of actual operations compared thereto),
22 conversations and connections with other corporate officers and employees,
23 attendance at management and Board of Directors meetings and committees
24 thereof and via reports and other information provided to them in connection
25 therewith.

26    46.    It is appropriate to treat the Individual Defendants as a group for
27 pleading purposes and to presume that the false, misleading and incomplete
28 information conveyed in the Company's public filings, press releases and other

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS          10

1  publications as alleged herein are the collective actions of the narrowly defined

2  group of defendants identified above.  Each of the above officers of Countrywide,

3  by virtue of their high-level positions with the Company, directly participated in

4  the management of the Company, was directly involved in the day-to-day

5  operations of the Company at the highest levels and was privy to confidential

6  proprietary information concerning the Company and its business, operations,

7  growth, financial statements, and financial condition, as alleged herein.  Said

8  defendants were involved in drafting, producing, reviewing and/or disseminating

9  the false and misleading statements and information alleged herein, were aware, or

10  recklessly disregarded, that the false and misleading statements were being issued

11  regarding the Company, and approved or ratified these statements, in violation of

12  the federal securities laws.

13      47.    As officers and controlling persons of a publicly held company whose

14  common stock and other securities were, and are, registered with the SEC pursuant

15  to the Exchange Act, and whose common stock was, and is, traded on the NYSE,

16  and governed by the provisions of the federal securities laws, the Individual

17  Defendants each had a duty to disseminate prompt, accurate and truthful

18  information with respect to the Company's financial condition and performance,

19  growth, operations, financial statements, business, markets, management and

20  earnings, and to correct any previously issued statements that had become

21  materially misleading or untrue, so that the market prices of the Company's

22  publicly traded securities would be based upon truthful and accurate information.

23  The Individual Defendants' misrepresentations and omissions during the Class

24  Period violated these specific requirements and obligations.

25      48.    The Individual Defendants participated in the drafting, preparation,

26  and/or approval of the various public and shareholder and investor reports and

27  other communications complained of herein and were aware of, or recklessly

28  disregarded, the misstatements contained therein and omissions therefrom, and

1   were aware of their materially false and misleading nature.  Because of their Board

2   membership and/or executive and managerial positions with Countrywide, each of

3   the Individual Defendants had access to the adverse undisclosed information about

4   Countrywide's financial condition and performance as particularized herein and

5   knew (or recklessly disregarded) that these adverse facts rendered the positive

6   representations made by or about Countrywide and its business issued or adopted

7   by the Company materially false and misleading.

8          49.    The Individual Defendants, because of their positions of control and

9   authority as officers and/or directors of the Company, were able to and did control

10  the content of the various SEC filings, press releases and other public statements

11  pertaining to the Company during the Class Period.  Each Individual Defendant

12  was provided with copies of the documents alleged herein to be misleading prior to

13  or shortly after their issuance and/or had the ability and/or opportunity to prevent

14  their issuance or cause them to be corrected.  Accordingly, each of the Individual

15  Defendants is responsible for the accuracy of the public reports and releases

16  detailed herein and is therefore primarily liable for the representations contained

17  therein.

18         50.    Defendant ABN AMRO Incorporated ("ABN AMRO") is a subsidiary

19  of ABN AMRO Bank, N.V., a Dutch corporation with global headquarters at

20  Gustav Mahlerlaan 10, 1082 PP Amsterdam, The Netherlands.  ABN AMRO has

21  U.S. headquarters at 55 East 52 Street, New York, New York 10055.  Defendant

22  ABN AMRO was an underwriter of Countrywide's offerings of Series A and

23  Series B Medium-Term Notes.

24         51.    Defendant A.G. Edwards & Sons, Inc. ("A.G. Edwards") is a division

25  of Wachovia Securities LLC and maintains its headquarters at 1 North Jefferson

26  Avenue, St. Louis, Missouri 63103.  Defendant A.G. Edwards was an underwriter

27  of CCV's public offering of 7% Capital Securities.

28

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS          12

52.     Defendant Banc of America Securities LLC ("Banc of America Securities") is the investment banking subsidiary of Bank of America, N.A., with headquarters at 9 West 57th Street, New York, New York 10019 and 100 North Tryon Street, Charlotte, North Carolina 28202, respectively.  Banc of America Securities was an underwriter of Countrywide's offerings of Series A and Series B Medium-Term Notes, 3-Year Floating Rate Notes due 2008, 6.25% Subordinated Floating Rate Notes due May 15, 2016, and CCV's offering of 7% Capital Securities.

53.     Defendant Barclays Capital Inc. ("Barclays") is the investment banking division of Barclays Bank PLC, with global headquarters at 1 Churchill Place, London, United Kingdom E14 5HP.  Defendant Barclays has U.S. headquarters at 200 Park Avenue, New York, New York 10166.  Barclays was an underwriter for Countrywide's offerings of Series A and Series B Medium-Term Notes, 6.25% Subordinated Floating Rate Notes due May 15, 2016, and CCV's offering of 7% Capital Securities.

54.     Defendant BNP Paribas Securities Corp. ("BNP Paribas") is a subsidiary of BNP Paribas, with global headquarters at 14 rue Bergère, 75009 Paris, France.  Defendant BNP Paribas has U.S. headquarters at 999 Bishop Street, Floor 29, Honolulu, Hawaii 96813.  BNP Paribas was an underwriter of Countrywide's offerings of Series A and Series B Medium-Term Notes.

55.     Defendant BNY Capital Markets, Inc. ("BNY") is a subsidiary of The Bank of New York, with headquarters at 44 Wall Street, New York, New York 1005.  BNY was an underwriter for Countrywide's offering of Series B Medium-Term Notes.

56.     Defendant Citigroup Global Markets Inc. ("Citigroup Global Markets") is a subsidiary of Citigroup Incorporated, a Delaware corporation with headquarters at 399 Park Avenue, New York, New York 10043.  Citigroup Global

1    Markets was an underwriter of Countrywide's offerings of Series A and Series B

2    Medium-Term Notes and CCV's offering of 7% Capital Securities.

3         57.    Defendant Countrywide Securities Corporation ("Countrywide

4    Securities") is a Delaware corporation and subsidiary of Countrywide, with

5    headquarters at 4500 Park Granada Boulevard, Calabasas, California 91302.

6    Countrywide Securities was an underwriter of Countrywide's offerings of Series A

7    and Series B Medium-Term Notes, 2-year Floating Rate Notes due 2007, 3-year

8    Floating Rate Notes due 2008, Floating Rate Subordinated Notes due April 1,

9    2011, 6.25% Subordinated Floating Rate Notes due May 15, 2016, and CCV's

10   offering of 7% Capital Securities.

11        58.    Defendant Deutsche Bank Securities Inc. ("Deutsche Bank") is a

12   subsidiary of the Deutsche Bank Group, a German corporation with headquarters

13   at Taunusanlage 12 60262 Frankfurt, Germany.  Defendant Deutsche Bank's U.S.

14   headquarters are located at One Fawcett Place, Floor 3, Greenwich, Connecticut

15   06830.  Deutsche Bank was an underwriter of Countrywide's offerings of Series A

16   and Series B Medium-Term Notes, 2-year Floating Rate Notes due 2007, 3-year

17   Floating Rate Notes due 2008, 6.25% Subordinated Notes due May 15, 2016, and

18   CCV's offering of 7% Capital Securities.

19        59.    Defendant Dresdner Kleinwort Wasserstein Securities Inc. ("Dresdner

20   Kleinwort Wasserstein") is a subsidiary of Dresdner Bank AG, a German

21   corporation with headquarters at Juergen-Ponto-Platz 1 60301 Frankfurt, Germany.

22   Defendant Dresdner has U.S. headquarters at 1301 Avenue of the Americas, New

23   York, New York 10019.  Dresdner was an underwriter of Countrywide's offerings

24   of Series A and Series B Medium-Term Notes, 2-year Floating Rate Notes due

25   2007 and 3-year Floating Rate Notes due 2008.

26        60.    Defendant Goldman, Sachs & Co. ("Goldman Sachs") is a subsidiary

27   of The Goldman Sachs Group Incorporated, a Delaware corporation with

28   headquarters at 85 Broad Street, New York, New York 10004.  Goldman Sachs

1   was an underwriter for Countrywide's offerings of Series A and Series B Medium-
2   Term Notes and CCV's offering of 7% Capital Securities.

3       61.    Defendant Greenwich Capital Markets, Inc. ("Greenwich"), a
4   subsidiary of the Royal Bank of Scotland Group plc, is headquartered at 600
5   Steamboat Road, Greenwich, Connecticut 06830.  Greenwich Capital was an
6   underwriter of Countrywide's offerings of Series A and Series B Medium-Term
7   Notes and 2-Year Notes due 2007 and 3-Year Floating Rate Notes due 2008.

8       62.    Defendant HSBC Securities (USA) Inc. ("HSBC") is a subsidiary of
9   the HSBC Group, with headquarters at 8-16 Canada Square, Canary Wharf,
10  London E14, United Kingdom.  Defendant HSBC's U.S. headquarters are located
11  at 2700 Sanders Road, Prospect Heights, Illinois 60070.  HSBC was an underwriter
12  of Countrywide's offerings of Series A and Series B Medium-Term Notes, 6.25%
13  Subordinated Floating Rate Notes due May 15, 2016, and CCV's offering of 7%
14  Capital Securities.

15      63.    Defendant J.P. Morgan Securities Inc. ("J.P. Morgan Securities") is a
16  subsidiary of J.P. Morgan Chase & Co., a Delaware corporation with headquarters
17  at 270 Park Avenue, New, New York 10017.  J.P. Morgan Securities was an
18  underwriter of Countrywide's offerings of Series A and Series B Medium-Term
19  Notes, Floating Rate Subordinated Notes due April 1, 2011, 6.25% Subordinated
20  Floating Rate Notes due May 15, 2016, and CCV's offering of 7% Capital
21  Securities.

22      64.    Defendant Lehman Brothers Inc. ("Lehman Brothers") is a subsidiary
23  of Lehman Brothers Holdings Inc., a Delaware corporation with headquarters at
24  745 7th Avenue, New York, New York 10019.  Lehman Brothers was an
25  underwriter of Countrywide's offerings of Series A and Series B Medium-Term
26  Notes, 2-Year Floating Rate Notes due 2007 and 3-Year Floating Rate Notes due
27  2008, and CCV's offering of 7% Capital Securities.

28

65.    Defendant Merrill, Lynch, Pierce, Fenner & Smith Incorporated ("Merrill Lynch") is a subsidiary of Merrill Lynch & Co., a Delaware corporation with headquarters at 4 World Financial Center, New York, New York 10080. Merrill Lynch was an underwriter of Countrywide's offering of Series B Medium-Term Notes, and CCV's offering of 7% Capital Securities.

66.    Morgan Stanley & Co. Incorporated ("Morgan Stanley") is a subsidiary of Morgan Stanley, a Delaware Corporation with headquarters at 1595 Broadway, New York, New York 10036. Morgan Stanley was an underwriter of Countrywide's offerings of Series A and Series B Medium-Term Notes, 2-Year Floating Rate Notes due 2007, 3-Year Floating Rate Notes due 2008, and CCV's offering of 7% Capital Securities.

67.    Defendant RBC Capital Markets Corp. ("RBC Capital Markets") is the investment banking arm of the Royal Bank of Canada, incorporated in Montreal with global headquarters at 200 Bay Street, Royal Bank Plaza, Toronto, Ontario M5J 2J5, Canada. Defendant RBC Capital Markets has U.S. headquarters at 1211 Avenue of the Americas, Suite 3201, New York, New York 10036. RBC Capital Markets was an underwriter of Countrywide's offerings of Series A and Series B Medium-Term Notes.

68.    Defendant RBC Dominion Securities Inc. ("RBC Dominion") is a subsidiary of the Royal Bank of Canada Incorporated with global headquarters at 200 Bay Street, Royal Bank Plaza, Toronto, Ontario M5J 2J5, Canada. Defendant RBC Dominion has U.S. headquarters at 1211 Avenue of the Americas, Suite 3201, New York, New York 10036. RBC Dominion was an underwriter of Countrywide's offerings of Series A and Series B Medium-Term Notes.

69.    Defendant RBC Dain Rauscher Inc. ("RBC Dain Rauscher") is a wholly owned subsidiary of the Royal Bank of Canada, headquartered at 200 Bay Street, Royal Bank Plaza, Toronto, Ontario M5J 2J5, Canada. RBC Dain Rauscher maintains its headquarters at Dain Rauscher Plaza, 60 South 6th Street,

1    Minneapolis, Minnesota 55402.  RBC Dain Rauscher was an underwriter of CCV's

2    offering of 7% Capital Securities.

3         70.    Defendant Scotia Capital Inc. ("Scotia Capital") is the investment

4    banking arm of the Scotiabank Group, with global headquarters at Scotia Plaza, 44

5    King Street West, Toronto, Ontario M5H 1H1, Canada.  Defendant Scotia has U.S.

6    headquarters located at One Liberty Plaza, New York, New York 10006.  Scotia

7    Capital was an underwriter of Countrywide's offering of Series B Medium-Term

8    Notes.

9         71.    Defendant SG Americas Securities ("SG Americas Securities") is a

10   subsidiary of Societe Generale, with headquarters at 1221 Avenue of the Americas,

11   New York, New York 10020.  SG Americas Securities was an underwriter for

12   Countrywide's offerings of Series A and Series B Medium-Term Notes and 2-Year

13   Floating Rate Notes due 2007.

14        72.    Defendant TD Securities Inc. ("TD Securities") is the investment

15   banking arm of TD Bank Financial Group, a Canadian company with headquarters

16   at Toronto-Dominion Centre, King Street West and Bay Street, Toronto, Ontario

17   M5K 1A2.  TD Securities was an underwriter for Countrywide's offering of Series

18   B Medium-Term Notes.

19        73.    Defendant UBS Securities LLC ("UBS Securities") is a subsidiary of

20   UBS AG, a Swiss corporation with global headquarters at Bahnhofstrasse 45,

21   Zurich, Switzerland and Aeschenvorstadt 1 Basel, Switzerland.  UBS Securities

22   maintains its U.S. headquarters at 1285 Avenue of the Americas, New York, New

23   York 10019.  UBS Securities was an underwriter for Countrywide's offering of

24   Series B Medium-Term Notes and CCV's offering of 7% Capital Securities.

25        74.    Defendant Wachovia Capital Markets, LLC ("Wachovia Capital

26   Markets") is a subsidiary of Wachovia Corporation, a North Carolina corporation

27   with headquarters at One Wachovia Center, Charlotte, North Carolina 28288.

28   Wachovia Capital Markets was an underwriter for Countrywide's offerings of

1    Series A and Series B Medium-Term Notes, 2-Year Floating Rate Notes due 2007,

2    3-Year Floating Rate Notes due 2008, 6.25% Subordinated Notes due May 15,

3    2016, and CCV's offering of 7% Capital Securities.

4        75.    Defendant Wachovia Securities, Inc. ("Wachovia Securities") is also a

5    subsidiary of Wachovia Corporation headquartered in Charlotte, North Carolina.

6    Wachovia Securities was an underwriter for Countrywide's offering of Series A

7    Medium-Term Notes.

8        76.    The Defendants enumerated in paragraphs 50-75 are referred to herein

9    collectively as the "Underwriter Defendants."

10        77.    Defendant Grant Thornton LLP ("Grant Thornton") is a global

11    accounting firm with headquarters at 175 West Jackson Boulevard, 20th Floor,

12    Chicago, Illinois 60604. Defendant Grant Thornton served as Countrywide's

13    outside auditor during part of the Class Period and audited  the Company's

14    consolidated financial statements for the year ended December 31, 2003.

15        78.    Defendant KPMG LLP ("KPMG") is a global accounting and

16    consulting firm.  KPMG replaced Grant Thornton as Countrywide's outside auditor

17    on or about January 6, 2004 and audited Countrywide's consolidated financial

18    statements for the years ended December 31, 2004, 2005 and 2006.  KPMG's U.S.

19    headquarters are located at 345 Park Avenue, New York, New York 10154.

20

21                **PLAINTIFFS' CLASS ACTION ALLEGATIONS**

22        79.    Plaintiffs bring this action as a class action pursuant to Federal Rule of

23    Civil Procedure 23(a) and (b)(3) on behalf of a Class consisting of all persons and

24    entities who purchased or otherwise acquired the publicly traded securities of

25    Countrywide between April 7, 2004 and August 9, 2007, inclusive and who were

26    damaged thereby, including all persons or entities who acquired shares of

27    Countrywide common stock in the secondary market or pursuant to a registration

28    statement, and all persons and entities who acquired debt securities or preferred

1   securities of Countrywide in the secondary market or pursuant to a registration

2   statement (the "Class").  Excluded from the Class are defendants, the officers and

3   directors of the Company at all relevant times, members of their immediate

4   families and their legal representatives, heirs, successors or assigns and any entity

5   in which defendants have or had a controlling interest.

6       80.    The members of the Class are so numerous that joinder of all

7   members is impracticable.  Throughout the Class Period, Countrywide had more

8   than 570 million shares of common stock outstanding that traded on the NYSE,

9   and billions of dollars worth of debt securities issued by Countrywide through the

10  Underwriter Defendants.  While the exact number of Class members is unknown to

11  Plaintiffs at this time and can only be ascertained through appropriate discovery,

12  Plaintiffs believe that there are thousands of members of the proposed Class.

13  Record owners and other members of the Class may be identified from records

14  maintained by Countrywide or its transfer agent and may be notified of the

15  pendency of this action by mail, using the form of notice similar to that

16  customarily used in securities class actions.

17      81.    Plaintiffs' claims are typical of the claims of the members of the Class

18  as all members of the Class are similarly affected by defendants' wrongful conduct

19  in violation of federal law that is complained of herein.

20      82.    Plaintiffs will fairly and adequately protect the interests of the

21  members of the Class and have retained counsel competent and experienced in

22  class and securities litigation.

23      83.    Common questions of law and fact exist as to all members of the

24  Class and predominate over any questions solely affecting individual members of

25  the Class.  Among the questions of law and fact common to the Class are:

26          (a)    whether the federal securities laws were violated by defendants'

27  acts as alleged herein;

28

1     (b)     whether statements made by defendants to the investing public

2 during the Class Period misrepresented material facts about the business,

3 operations and management of Countrywide; and

4     (c)     to what extent the members of the Class have sustained

5 damages and the proper measure of damages.

6     84.    A class action is superior to all other available methods for the fair

7 and efficient adjudication of this controversy since joinder of all members is

8 impracticable.  Furthermore, as the damages suffered by individual Class members

9 may be relatively small, the expense and burden of individual litigation make it

10 impossible for members of the Class to individually redress the wrongs done to

11 them.  There will be no difficulty in the management of this action as a class

12 action.

13

14            **THE MATERIALLY FALSE AND MISLEADING**

15            **REPRESENTATIONS MADE BY DEFENDANTS**

16 **The Company's False Statements Regarding 2003 Year-End Results**

17     85.    On March 12, 2004, Countrywide filed its 2003 annual report with the

18 SEC on Form 10-K, dated March 10, 2004 (the "2003 Form 10-K").  The 2003

19 Form 10-K was signed by Defendants Mozilo, Kurland, Cisneros, Cunningham,

20 Donato, Dougherty, Enis, Heller, King, Melone, Russell, Robertson and Snyder.

21 The Company reported that revenues rose to $7,978,642,000 in 2003, from

22 $4,519,466,000 in 2002, while earnings declined from $6.49 per diluted share in

23 2002 to $4.18 per diluted share in 2003.

24     86.    In a section of the Form 10-K titled "Mortgage Credit Risk," the

25 Company described its Credit Policy, portraying it as a tightly controlled and

26 supervised process "designed to produce high quality loans" through a rigorous

27 pre-loan screening procedure and post-loan auditing and appraisal and

28 underwriting reviews:

---

Loan Quality

Our Credit Policy establishes standards for the determination of acceptable credit risks. Those standards encompass borrower and collateral quality, underwriting guidelines and loan origination standards and procedures.

Borrower quality includes consideration of the borrower's credit and capacity to pay. We assess credit and capacity to pay through the use of credit scores, application of a mortgage scorecard, and manual or automated underwriting of additional credit characteristics.

Collateral quality includes consideration of property value, condition and marketability and is determined through physical inspections and the use of manual and automated valuation models.

Underwriting guidelines facilitate the uniform application of underwriting standards to all borrowers regardless of race, religion or ethnic background. Uniformity in underwriting also provides a means for measuring and managing credit risk. This allows us, as well as government sponsored entities ("GSEs"), private investors, and the secondary markets in general, to assess risk, which provides us with more flexibility in the sale of loans.

Our conventional conforming underwriting guidelines comply with the guidelines established by Fannie Mae or Freddie Mac. Our underwriting guidelines for FHA-insured and VA-guaranteed mortgage loans comply with guidelines established by the U.S. Department of Housing and Urban Development or the Veterans Administration. Our underwriting guidelines for non-conforming mortgage loans, Prime Home Equity Loans, and Nonprime Mortgage Loans have been designed so that these loans are salable in the secondary mortgage market. We developed these guidelines to meet the requirements of private investors, rating agencies and third-party credit enhancement providers.

Our loan origination standards and procedures are designed to produce high quality loans. These standards and procedures encompass underwriter qualifications and authority levels, appraisal review requirements, fraud prevention, funds disbursement controls, training of our employees and ongoing review of their work. We help to ensure that our origination standards are met by employing accomplished and seasoned management, underwriters and processors and through the extensive use of technology. We also have a comprehensive training program for the continuing development of both our existing staff and new hires. In addition, we employ

proprietary underwriting systems in our loan origination process that improve the consistency of underwriting standards, assess collateral adequacy and help to prevent fraud, while at the same time increasing productivity.

In addition to our pre-funding controls and procedures, we employ an extensive post-funding quality control process. Our Quality Control Department, under the direction of the Chief Credit Officer, is responsible for completing comprehensive loan audits that consist of a re-verification of loan documentation, an in-depth underwriting and appraisal review, and if necessary, a fraud investigation. We also employ a pre- and post-funding proprietary loan performance evaluation system. This system identifies fraud and poor performance of individuals and business entities associated with the origination of our loans. The combination of this system and our audit results allows us to evaluate and measure adherence to prescribed underwriting guidelines and compliance to laws and regulations to ensure that current loan production represents acceptable credit risk, as defined by the Board of Directors.

87.    The Company reported loan loss reserves of $78,449,000 at the end of 2003, having recorded a provision for loan losses of $48,107,000 during the year. The Company also had net charge-offs of $14,860,000.

88.    Further assuring investors of the veracity of the information contained in the Form 10-K, the report included a certification signed by Defendant Mozilo, representing that the report was free from misstatements and that the Company employed internal disclosure controls and procedures:

1.    I have reviewed this annual report on Form 10-K of Countrywide Financial Corporation;

2.    Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.    Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.    The registrant's other certifying officers and I are responsible for establishing and maintaining disclosure

controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) for the registrant and have:

(a)  Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

(b)  Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

(c)  Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.  The registrant's other certifying officers and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of registrant's board of directors (or persons performing the equivalent functions):

(a)  All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

(b)  Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

89.  Defendant Grant Thornton issued an unqualified audit report on Countrywide's financial statements for the year ended December 31, 2003, which was included in the 2003 Form 10-K. In this unqualified audit report, dated February 27, 2004, Grant Thornton certified: (a) that it had audited Countrywide's financial statements in accordance with Generally Accepted Audit Standards

1  ("GAAS"); (b) that it had planned and performed those audits "to obtain

2  reasonable assurance about whether the financial statements are free of material

3  misstatement"; (c) that, in its opinion, Countrywide's financial statements "present

4  fairly, in all material respects, the consolidated financial position" of Countrywide

5  "in conformity with" Generally Accepted Accounting Principles ("GAAP"); and

6  (d) that its audits provided a "reasonable basis" for its opinions.

7       90.    On April 7, 2004, Countrywide and certain of its affiliates filed a shelf

8  registration statement (with securities to be offered on a delayed or continuous

9  basis pursuant to SEC Rule 415), including two base prospectuses and one

10  prospectus supplement, on Form S-3 (the "April 7, 2004 Registration Statement")

11  for the sale to the public of up to $15,127,000,000 in different types of securities,

12  including among other things debt securities, common stock, and preferred stock.

13  The April 7, 2004 Registration Statement stated that "[t]he prices and other terms

14  of the securities that [the Company] or Countrywide Home Loans will offer will be

15  determined at the time of their offering."

16       91.    The April 7, 2004 Registration Statement was signed by Defendants

17  Mozilo, Cisneros, Cunningham, Donato, Dougherty, Enis, Garcia, Heller, King,

18  Kurland, Melone, Robertson, Russell and Snyder.

19       92.    The April 7, 2004 Registration Statement incorporated by reference

20  Countrywide's 2003 Form 10-K.

21       93.    Grant Thornton was named as an expert in the April 7, 2004

22  Registration Statement as having audited Countrywide's financial statements for

23  the year ended December 31, 2003, which financial statements were incorporated

24  by reference in the April 7, 2004 Registration Statement.  Grant Thornton issued an

25  unqualified audit opinion on Countrywide's financial statements for the year ended

26  December 31, 2003.

27       94.    On or about February 7, 2005, Countrywide commenced a public

28  offering of $8,000,000,000 of Medium-Term Notes, Series A to be offered on a

1   continuous basis by Countrywide pursuant to the April 7, 2004 Registration

2   Statement and a Prospectus Supplement dated February 7, 2005 and filed with the

3   SEC on February 8, 2005. This Prospectus Supplement, which included a

4   Prospectus dated April 21, 2004 (the "April 21, 2004 Prospectus"), stated that

5   "[t]he final terms for each Note will be described in a pricing supplement prepared

6   at the time the Notes are offered for sale." The offering of Series A Medium-Term

7   Notes was underwritten by Defendants Barclays Capital, Citigroup Global

8   Markets, Deutsche Bank, Countrywide Securities, RBC Capital Markets,

9   Greenwich Capital, Banc of America Securities, HSBC, J.P. Morgan Securities,

10  Lehman Brothers, Wachovia Capital Markets, Dresdner Kleinwort Wasserstein,

11  Morgan Stanley, SG Americas Securities, ABN AMRO, BNP Paribas, Goldman

12  Sachs, RBC Dominion, and Wachovia Securities, Inc. The Series A Medium-

13  Term Notes were offered through a series of pricing supplements and Free Writing

14  Prospectuses dated between March 16, 2005 and February 1, 2006 and filed with

15  the SEC under Rule 424.

16      95.    The April 21, 2004 Prospectus, which was included with the February

17  7, 2005 Prospectus Supplement, incorporated by reference Countrywide's 2003

18  Form 10-K.

19      96.    Grant Thornton was named as an expert in the April 21, 2004

20  Prospectus as having audited Countrywide's financial statements for the year

21  ended December 31, 2003, which financial statements were incorporated by

22  reference in the April 21, 2004 Prospectus.

23      97.    On December 14, 2005, Countrywide filed a Prospectus Supplement

24  with the SEC, supplementing the April 21, 2004 Prospectus and February 7, 2005

25  Prospectus Supplement, stating that as of December 12, 2005, Countrywide

26  increased the principal amount of Series A Medium-Term Notes that may be

27  offered from $8 billion to $8.627 billion. Net proceeds from this offering to

28  Countrywide, after deducting offering expenses, were approximately $7.9 billion.

**The Company's False Statements Regarding 2004 Results**

98.    On April 21, 2004, the Company issued a press release announcing results for the first quarter of 2004, reporting that earnings per diluted share increased 82 percent over the same quarter last year to $2.22. Defendant Mozilo, commenting on the results, touted the Company's flexibility and risk management for the Company's successful quarter in an environment made more difficult by rising interest rates:

> "Outstanding operational and financial results characterized the first quarter of 2004," said Angelo R. Mozilo, Chairman and Chief Executive Officer. "This performance, in light of rapidly shifting environmental conditions, illustrates the strength and flexibility of our business model and risk management strategies, as the Company delivered impressive results. Earnings from both our Mortgage Banking segment and our Diversified Businesses increased sequentially and year-over-year.

> "In the Mortgage Banking segment, principal success factors included continued high funding volume, effective servicing hedge management and managed inventory sales," Mozilo continued. "On the Servicing side, strong portfolio growth continued to support the core strategy of counterbalancing the performance of our production and servicing operations. During the quarter we achieved net portfolio growth of $38 billion, while growth over the last 12 months has been a remarkable $181 billion. With the 10-year U.S. Treasury yield showing a net decrease of more than 40 basis points between the beginning and the end of the first quarter, Countrywide recorded $996 million in MSR impairment expense, the impact of which was largely offset by MSR hedge gains (net of hedge cost) of $673 million, resulting in net impairment of $323 million. Net MSR impairment was more than offset by increased production profitability.

99.    On a conference call held later that day, defendant Mozilo addressed an analyst's concern about the Company's subprime loans by representing that the Company knows the subprime business better than its competitors and that it will not back away from the business like some competitors have done:

> **Angelo Mozilo, Countrywide Financial Corp. -**
> ***Chairman, President, CEO***

1   But in terms of what the competition does, you have had
2   just a sense of history, GE was in the mortgage business
    and got out of the entire mortgage business. Bank of
3   America was in the correspondent business and got out of
    the correspondent business for a substantial period of
4   time. You know, you have shifts all over the place. It
    depends on your ability to manage it. And we have
5   successfully managed this product for years. **And so I
    think using what our competitors do as a barometer
6   will put you down the wrong path. We are a very
    different focused company that understands this
7   product very well, how to originate it, how to manage
    it, how to underwrite, how to service it. And so we
8   look at -- the short answer to your question is --** we
    look at this sub-prime business as a -- one that has to be
9   carefully manage[d], but one that has a tremendous
    opportunity for us long into the future, certainly through
10  the balance of this decade and beyond. So we don't think
    it has a short leash on it and that we'll pull it as other
11  companies have. Again, these companies have been in
    and out -- all aspects of the mortgage banking business
12  and ones that we've stayed in for 36 years and very
    effectively and profitably. You want to get into the
13  metrics side of the cash?

Emphasis added.
14
15      100.    Responding to an analyst's question as to Countrywide's potential
16  risks in selling non-traditional, and riskier loans, such as subprime loans, Mozilo
17  stated that Countrywide had taken a more disciplined approach than its
18  competitors, and was not involved in the "frothy business" that others engaged in:

19      **Angelo Mozilo, Countrywide Financial Corp. -**
        **_Chairman, President, CEO_**

20      Let me make this point, because I think you raise some
        very good points. Sub-prime cannot be looked at
21      generically. There is very, very good solid sub-prime
        business and there is this frothy business that you relate
22      to. And you have to -- when you're doing your analysis,
        what is the average FICO scored of these. Because you
23      can get so deep into this marginal credit that you can
        have serious problems where you are taking 400 FICOs
24      with no documentation; that is dangerous st[u]ff. So
        think it is very important that you understand the
25      disciplines that the Company had, particularly that
        Countrywide has, which are very strong disciplines in
26      the origination of sub-prime loans. And maintaining
        that discipline is critically important to us. I don't
27      think, when you look at sub-prime, you have to look
        at it in various tranches, and we are at the high end of
28      that tranche.

---

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS          27

1    101.   On May 7, 2004, Countrywide filed its quarterly report on Form 10-Q

2    for the first fiscal quarter of 2004, ending March 31, 2004 ("1Q04 report").  The

3    report was signed by defendant Kurland and then-CFO Thomas McLaughlin

4    ("McLaughlin").  The Company reported revenues for the quarter of

5    $2,214,903,000, compared with revenues of $1,450,624,000 for the same period in

6    2003.  Diluted earnings per share for the quarter ended March 31, 2004 were

7    $2.22, an 82% increase over diluted earnings per share for the quarter ended

8    March 31, 2003.

9    102.   The Company described its management of credit risk in the

10    following terms:

11    > We also face credit risk, primarily related to our
    > residential mortgage production activities. Credit risk is

12    > the potential for financial loss resulting from the failure
    > of a mortgagor or an institution to honor its contractual

13    > obligations to us. We manage mortgage credit risk
    > principally by securitizing substantially all mortgage

14    > loans that we produce, **and by only retaining high
    > credit quality mortgages in our loan portfolio.**

15    [Emphasis added].

16    103.   The Company reported loan loss reserves of $93,054,000 at the end of

17    the first quarter of 2004, having increased its provision for loan losses by

18    $20,779,000 during the quarter.  This amount is subtracted from revenues and

19    lowers net income.

20    104.   Further assuring investors of the veracity of the information contained

21    in the Form 10-Q, the report included a certification signed by defendant Mozilo,

22    representing that the report was free from misstatements and that the Company

23    employed internal disclosure controls and procedures:

24    > (a)  I have reviewed this quarterly report on Form 10-Q of
    > Countrywide  Financial Corporation;

25    > (b)  Based on my knowledge, this report does not contain any
    > untrue statement of a material fact or omit to state a

26    > material fact necessary to make the statements made, in
    > light of the circumstances under which such statements

were made, not misleading with respect to the period covered by this report;

(c) Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

(d) The registrant's other certifying officers and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) for the registrant and have:

   (i) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

   (ii) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

   (iii) Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

(e) The registrant's other certifying officers and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of registrant's board of directors (or persons performing the equivalent functions):

   (i) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

   (ii) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS                    29

1    105.   On July 22, 2004, Countrywide announced in a press release that

2   earnings per diluted share grew by 64% in the second quarter of 2004, as compared

3   with the second quarter of 2003.  Commenting on the results, Defendant Mozilo

4   noted that they were achieved in a tough environment and that Countrywide's

5   impressive performance demonstrated its ability to "prudently manage risk":

6           "During a quarter with transitional market conditions,
            Countrywide delivered solid results," said Angelo R.
7           Mozilo, Chairman and Chief Executive Officer. "Diluted
            earnings per share were $2.24, our second best quarter on
8           record. This demonstrates Countrywide's ability to
            execute its strategic plan, prudently manage risk, and
9           right size its operational infrastructure in the midst of a
            volatile interest rate environment.
10
11    106.   On August 6, 2004, Countrywide filed its quarterly report on Form

12   10-Q for the second fiscal quarter of 2004, ending June 30, 2004.  The report was

13   signed by defendant Kurland and then-CFO McLaughlin.  The Company reported

14   revenues for the quarter of $2,333,104,000, compared with revenues of

15   $1,628,315,000 for the same period in 2003.  Diluted earnings per share for the

16   quarter ended June 30, 2004 was $2.24, compared with diluted earnings per share

17   of $1.37 for the same period in 2003.

18    107.   The Company described its management of credit risk in the

19   following terms:

20           We also face credit risk, primarily related to our
            residential mortgage production activities. Credit risk is
21           the potential for financial loss resulting from the failure
            of a mortgagor or an institution to honor its contractual
22           obligations to us. We manage mortgage credit risk
            principally by securitizing substantially all mortgage
23           loans that we produce, **and by only retaining high
            credit quality mortgages in our loan portfolio.**

24   [Emphasis added.]

25    108.   The Company reported loan loss reserves of $105,839,000 at the end

26   of the quarter, having increased its provision for loan losses by $19,747,000 during

27   the quarter.

28

---

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS          30

109. Further assuring investors of the veracity of the information contained in the Form 10-Q, the report included a certification signed by defendant Mozilo, representing that the report was free from misstatements and that the Company employed internal disclosure controls and procedures:

    (a) I have reviewed this annual report on Form 10-Q of Countrywide Financial Corporation;

    (b) Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

    (c) Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

    (d) The registrant's other certifying officers and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

        (i) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

        (ii) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

        (iii) Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect,

    (e) The registrant's other certifying officers and I have disclosed, based on our most recent evaluation of internal

1   control over financial reporting, to the registrant's auditors
    and the audit committee of registrant's board of directors
2   (or persons performing the equivalent functions):

3   (i)   All significant deficiencies and material weaknesses
          in the design or operation of internal control over
4         financial reporting which are reasonably likely to
          adversely affect the registrant's ability to record,
5         process, summarize and report financial information;
          and
6
    (ii)  Any fraud, whether or not material, that involves
7         management or other employees who have a
          significant role in the registrant's internal control over
8         financial reporting.

9       110.   On October 20, 2004, Countrywide issued a press release announcing

10  results for the third quarter of 2004, reporting earnings per diluted share of $0.94

11  per share, the fourth highest quarter on record. Defendant Mozilo again highlighted

12  Countrywide's apparent ability to deliver in a tough environment that had seen

13  interest rates rise by 50 basis points, stating as follows:

14          "In a quarter characterized by significant interest rate
            movements, Countrywide delivered one of its best
15          quarters ever," said Angelo R. Mozilo, Chairman and
            Chief Executive Officer. "During the quarter, the Fed
16          raised interest rates by 50 basis points, yet the 10-year
            U.S. Treasury yield decreased by 48 basis points.
17          Countrywide's financial results for the quarter --
            highlighted by diluted earnings per share of $0.94 -- once
18          again demonstrate the strength and resilience of our
            business model. On a year-over-year basis, third quarter
19          earnings are difficult to compare given the record
            refinance volume and the convergence of other favorable
20          events experienced during last year's third quarter, which
            generated by far the best financial results in the
21          Company's history.

22      111.   On November 8, 2004, Countrywide filed its quarterly report on Form

23  10-Q for the third fiscal quarter of 2004, ending September 30, 2004.  The report

24  was signed by defendant Kurland and McLaughlin.  The Company reported

25  revenues for the quarter of $2,245,607,000, compared with revenues of

26  $2,923,370,000 for the same period in 2003.  Diluted earnings per share for the

27  quarter ended September 30, 2004 was $0.96, compared with diluted earnings per

28  share of $1.93 during the same period in 2003.

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS       32

112.    The Company described its management of credit risk in the following terms:

> We also face credit risk, primarily related to our residential mortgage production activities. Credit risk is the potential for financial loss resulting from the failure of a mortgagor or an institution to honor its contractual obligations to us. We manage mortgage credit risk principally by securitizing substantially all mortgage loans that we produce, and by only retaining high credit quality mortgages in our loan portfolio.

113.    The Company reported loan loss reserves of $107,765,000, having increased its provision for loan losses by $8,360,000 during the quarter.

114.    Further assuring investors of the veracity of the information contained in the Form 10-Q, the report included a certification signed by defendant Mozilo, representing that the report was free from misstatements and that the Company employed internal disclosure controls and procedures:

> (a)    I have reviewed this quarterly report on Form 10-Q of Countrywide Financial Corporation;
>
> (b)    Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;
>
> (c)    Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;
>
> (d)    The registrant's other certifying officers and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) for the registrant and have:
>
> > (i)    Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;